Ms. Kathy Peters McDowell, Rice, Smith Gaar Forty Executive Hills 7101 College Blvd., Suite 200 Overland Park, Kansas 66210-1891
Dear Ms. Peters:
As bond counsel for the city of Merriam, Kansas you seek an Attorney General opinion as to whether tax increment costs incurred at the commencement of a tax increment project can be repaid over time from tax increment revenues without the issuance of tax increment bonds. As background, you provide the following information.
The city has established a redevelopment district and has adopted a redevelopment plan pursuant to K.S.A. 12-1770 et seq., as amended, (act), in connection with a project known as the Homestead Village Project (project). The salient features of the project are as follows: The project area is approximately 5.2 acres and generally know as 6451 East Frontage Road. The area is generally bounded by Gold's Gym on the south and Green Country Inn on the north, within the city. The project will consist of an extended stay lodging facility of approximately 134 lodging rooms and a pad site of approximately 7,000 square feet to be developed for restaurant or other commercial purposes compatible with a lodging facility, both planned with appropriate parking, landscaping, storm water facilities and ingress and egress. The city has entered into a disposition and development agreement (agreement) with PTR Homestead Village, Inc. (developer) for redevelopment of the site. You have enclosed a copy of the agreement for our perusal.
You note that under the act, certain costs of a redevelopment project are eligible to be financed with tax increment generated from the project area. These eligible costs known as the tax increment finance (TIF) costs are itemized in K.S.A. 12-1774. The proposed agreement contemplates that the developer will expend an amount not to exceed $546,850 for TIF costs, as set forth on exhibit 3 attached to the agreement, and other eligible costs incurred by the city not to exceed $30,000. Pro forma figures provided by Springsted Inc., financial advisor to the city, indicate that the project will support an increment sufficient to pay the foregoing. In article IV of the agreement, the city and the developer provide for two alternatives for long-term financing of the TIF costs. The first alternative, clearly specified in the act, is that the city would issue a series of special obligation tax increment bonds. The second alternative, described by the city and the developer as a "pay-as-you-go" method of financing, would entail the developer funding the cost of implementation of the project. Each year thereafter until the agreed-upon termination date, the city would use a percentage of the available tax increment revenues actually received by the city to reimburse the developer for the amount expended by the developer.
The intent of the act when read in its entirety seems clearly to be focused on providing cities with a mechanism to finance the development and redevelopment of central business districts. Among the financing methods specifically authorized for cities is the issuance of special obligation bonds or full faith and credit tax increment bonds pursuant to the provisions of K.S.A. 12-1774. The issue presented in this situation is whether the legislature intended the bond financing methods referenced to be the sole means of financing these districts. A common sense reading of the act would clearly indicate that cities are not foreclosed from considering alternate finance structures.
In arriving at this conclusion we first examine the stated intent of the act, expounded in K.S.A. 12-1770, and providing in relevant part that:
 "It is hereby declared to be the purpose of this act to promote, stimulate and develop the general and economic welfare of the state of Kansas and its communities and to assist in the development and redevelopment of central business district areas of cities, blighted areas located within cities, environmentally contaminated areas located within and without cities and enterprise zones located within cities, thus promoting the general welfare of the citizens of this state, by authorizing cities to acquire certain property and to issue special obligation bonds for the financing of redevelopment projects. It is further found and declared that the powers conferred by this act are for public uses and purposes for which public money may be expended and the power of eminent domain exercised. . . ."
It is our opinion that the proposed agreement is consistent with the stated purpose of the act as set forth in the above section. Additional support for our conclusion that the proposed agreement comports with the overall intent and spirit of the act may be found in other relevant portions of the act as well.
The act states in K.S.A. 1995 Supp. 12-1771 (h):
 "Any increment in ad valorem property taxes resulting from a redevelopment district undertaken in accordance with the provisions of this act, shall be apportioned to a special fund for the payment of the cost of the redevelopment project, including the payment of principal and interest on any special obligation bonds or full faith and credit tax increment bonds issued to finance such project pursuant to this act and may be pledged to the payment of principal and interest on such bonds. The maximum maturity on bonds issued to finance projects pursuant to this act shall not exceed 20 years." (Emphasis added.)
The act states in K.S.A. 12-1775(c)(2):
 "Any real property taxes produced from that portion of the current assessed valuation of real property within the redevelopment district constituting a separate taxing unit under the provisions of this section in excess of an amount equal to the total assessed value of such real property on the effective date of the establishment of the district shall be allocated and paid by the county treasurer to the treasurer of the city and deposited in a special fund of the city to pay the cost of redevelopment projects including the payment of principal and interest on any special obligation bonds or full faith and credit tax increment bonds issued by such city to finance, in whole or in part, such redevelopment project. When such obligation bonds and interest thereon have been paid, all moneys thereafter received from real property taxes within such redevelopment district shall be allocated and paid to the respective taxing subdivisions in the same manner as are other ad valorem taxes. If such obligation bonds and interest thereon have been paid before the completion of a project, the city may continue to use such moneys for any purpose authorized by this act until such time as the project is completed, but for not to exceed 15 years from the date of the establishment of the redevelopment district." (Emphasis added.)
We do not read this language to preclude the use of tax increment revenues to fund a redevelopment project over time without the issuance of bonds. While the statute seems to contemplate that the first use of tax increment revenues will be the payment of principal of and interest on any bonds issued, clearly, surplus revenues may be used to pay any authorized TIF cost. Both the section of the act cited directly above and K.S.A. 12-1778, support this contention.
K.S.A. 12-1778 mirroring some of the language above states:
 "Notwithstanding any other provision of law, it is hereby stated that it is an object of all ad valorem taxes levied by or for the benefit of any city, county or school district on taxable tangible real property located within any redevelopment district . . . that such taxes may be applied and allocated to and when collected . . . into a special fund of a city . . . to pay the cost of a project including principal of and interest on special obligation bonds or full faith and credit tax increment bonds issued by the city to finance, in whole or in part, such redevelopment project." (Emphasis added.)
A plain reading of these statutes conveys the intent of the legislature that the tax increment generated from the improvements made to these sites may serve as a reimbursement source for costs associated with the redevelopment district, including, but not limited to, payment of principal and interest on any bonds issued. The language chosen by the legislature expresses their intent that while tax increment may be used to pay principal and interest on any bonds issued, the increment is not restricted exclusively to bond payments. Because the legislature specifically provided that the tax increment could be used to repay financing costs associated with redevelopment district projects "including" principal and interest payments on bonds, they signal their cognizance that other finance mechanisms may be utilized by municipalities for which the tax increment may also legitimately be applied.
We believe that the act when read in its entirety supports the conclusion that the proposed agreement between the city and the developer is implicitly authorized by the act. Support may be found for this proposition in recent case law. The court in State v. Gonzales,255 Kan. 243 (1994) stated:
 "In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof in pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary literal import of words or phrases which conflict with the manifest purpose of the legislature. 255 Kan. at 249, quoting Brown v. Keill, 224 Kan. 195, syl. ¶¶ 2-4 (1978).
The court also reasoned in Citizens State Bank of Grainfield v. Kaiser,12 Kan. App. 2d 530, 536, rev. denied 243 Kan. 777 (1988), that:
 "In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to . . . the purpose to be accomplished, and the effect the statute may have under the various constructions suggested."
The plan advanced by the city and the developer whereby the developer would advance certain project costs to be later repaid with a portion of the tax increment generated by the improvement comports with the stated purpose of the act as initially set forth in K.S.A. 1995 Supp. 12-1770 to "promote, stimulate and develop the general and economic welfare of the state of Kansas," and is also consistent with stated objectives found throughout the act.
We believe, however, that the proposed agreement contemplated by and between the city and developer must be construed within the constraints prescribed by the act. Principally, we are concerned with K.S.A. 1995 Supp. 12-1771(g) which provides:
 "Any redevelopment plan undertaken within the redevelopment district may be in separate development states. Each plan shall be adopted according to the provisions of K.S.A. 12-1772, and amendments thereto, and shall fix a date for completion. Except as provided herein, any project shall be completed within 15 years from the date of the establishment of the redevelopment district. . . ."
Because the act limits the time period for payment of costs to fifteen years from the date of the establishment of the redevelopment district unless bonds are issued, in which case the time period is twenty years from the date the bonds are issued, any agreement for a project which contemplates paying redevelopment costs over time without the issuance of bonds must have assurances that such costs could be recovered from tax increment revenues over the fifteen year period commencing the establishment of the district. You have indicated to us that the proposed agreement will contain such covenants, and the proposed repayment schedule outlined in exhibit "A" to the proposed agreement is presently set up for a seven year pay off.
Because the act does not discuss with any degree of specificity the terms and conditions that must be met when a finance method other than bonds will be utilized, it is imperative that any agreement between the city and developer contain clear contractual statements concerning the understanding between the parties of all matters relating to the funding of the project and the reimbursement of the developer. Any such contract should articulate the project costs, how they will be paid by the developer, how the developer will be reimbursed for the costs, and a precise repayment schedule as would be found in a standard bond agreement.
In conclusion, it is our opinion that the plan the city and developer have proposed, whereby the respective parties would enter into a contractual agreement wherein the developer would advance the eligible expenses in an existing tax increment financing redevelopment district, and be reimbursed according to the agreed upon schedule from future tax increment received by the district is a valid finance structure pursuant to K.S.A. 12-1770 et seq., assuming compliance with all applicable provisions of the act.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Rebecca E. Floyd Assistant Attorney General
CJS:JLM:REF:jm